■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. ROBERT GRIMALDI, Appellant.— Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered March 13, 1973, convicting him of murder, upon a jury verdict, and imposing sentence. Judgment reversed, on the law, and indictment dismissed. Upon defendant's trial for the murder of Conrad Greaves, the People proved in support of their case in chief that at about 5:00 A.M. on March 30, 1972, defendant, a bartender employed by Greaves, walked with Greaves out of the rear door of the El Capitan Motel, in which the Cloud Room, a bar owned by Greaves, was located. Prior to leaving the motel defendant asked Theresa Bell, an employee of the coffee shop located in the motel, to wait for him in the motel's lobby. Instead, Bell left the motel and saw Greaves and defendant walk out of the motel's rear door towards Greaves' car parked at the curb. Greaves unlocked the front passenger door and, as he walked in front of his car towards the driver's side, defendant opened the front passenger door, causing the car's alarm to sound. When the alarm sounded, defendant darted towards the rear side of the car where, within the sight of Bell, he crouched but did nothing else. Greaves bent over the front of the car when he reached the driver's side and turned off the alarm. Before Greaves unlocked the front passenger door, Bell saw a man, gun in hand, about 20 feet from the car. As Greaves turned off the alarm, the gunman walked to a point about 10 feet from Greaves and shot him three times, twice in the head. At the time of the shooting, another man was standing next to the gunman while a third stood nearby. Bell identified the gunman as Daniel Jacobson and the man standing next to him as Ralph Jacobson. She testified that defendant ducked behind the rear passenger side of the car

as Daniel Jacobson, gun in hand, walked towards Greaves' car. After the shooting, Bell ran into the motel and saw defendant enter the motel through its rear door. Defendant approached Bell, complained that she had not remained in the motel as he had requested and told her to forget everything she had seen. Later that morning, defendant said to Bell that Greaves "got what he had coming to him," and, several days later, defendant said to her that she should state to the police that he was in the motel lobby at the time Greaves was shot. Several days thereafter, defendant said to Bell that, for the sake of Bell's boyfriend, a motel employee, defendant hoped that Bell had told the police what he had told her to say, and he hoped that "you are going to be my alibi." When interrogated by the police, defendant said he was in the motel lobby when Greaves was slain. In our opinion, the People, in their case in chief, failed to prove facts from which only inferences consistent with defendant's guilty participation in Greaves' murder could be drawn. By their proof, defendant was not the slayer but an accomplice, yet the People did not prove that defendant had persuaded or forced Greaves to leave the motel in order that he might be slain. Instead, the People's evidence inferentially proves the voluntary leaving of the motel by Greaves with defendant and defendant's reactive crouching behind Greaves' car when a man, gun in hand, and apparently accompanied by accomplices, walked toward Greaves' bent figure. No proof was given by the People that defendant knew the Jacobsons or any other person who allegedly participated in Greaves' slaying. That defendant acted in concert with the gunman and the latter's accomplices was not proved by defendant's statements following the slaying, none of which contain an admission of guilt by defendant and all of which are as consistent with a fear that he would be a suspect, or would be summoned as a witness, as they are consistent with a guilty state of mind. If the judgment were not reversible on the ground already assigned, it would be turned back on another. The case against defendant turned solely upon the credibility of Theresa Bell who, the evidence shows, had several times said to the police that she had not seen Greaves' slaying and had testified before the Grand Jury that defendant was with her in the motel lobby when Greaves was shot. At the trial, the People on direct examination elicited from Bell that she "entered the convent for a while" after graduating from high school and that, after leaving the convent, she was employed at the motel coffee shop. At the subsequent separate trial of the Jacobsons, however, Bell testified on cross-examination that she had merely applied for admission to a convent, had been "measured for my habit and I was in the counseling stage before being taken in altogether," had never spent a night in the convent, and in fact was not certain where it was located. At defendant's trial, the People in summation argued that defendant, who had testified that he was in the motel lobby at the time of the slaying, was a "Judas" against whose evidence was that of "the convent girl", a phrase repeated at least 29 times in the People's summation. The jury were told that "the only way you can approach it is that Theresa is a liar," that "she's twenty-four years old, and she was in a convent * * * if there's anything wrong with being in a convent, I'd like to know what it is." In February, 1973, subsequent to the Jacobsons' trial, defendant moved unsuccessfully to set aside the verdict in his case, alleging, among other things, the falsity of Theresa Bell's representation concerning her conventual life and the People's incisive use of that religious characterization against him at the trial. If no other error were before us, we would reverse the judgment and order a new trial, in the exercise of discretion in the interest of justice, because of the false evidence given by Bell

concerning her religious life. Gulotta, P. J., Martuscello, Latham, Cohalan and Benjamin, JJ., concur.